Common Pleas Court of Hamilton County.

CITY OF CINCINNATI V. GEORGE STRUBLE, ET AL.

Decided March 31, 1933.

*John D. Ellis*, city solicitor, *Ed. F. Alexander*, ass't. city solicitor, for plaintiff.

*Zielonka & Kuertz*, for defendants.

SCHWAB, J.

In these proceedings the city of Cincinnati and Eleanor H. Meyer are seeking to enjoin the defendants from using their property, located on the south side of Lower River Road just west of the terminus loop of the Cincinnati Street Railway Company, for conducting the business of a restaurant and soft drink parlor in alleged violation of the zoning ordinance of the city of Cincinnati, which places the property upon which the soft drink parlor is located in a residence "B" district of the city of Cincinnati.

Prior to the bringing of these proceedings criminal prosecutions were instituted in the Municipal Court of the city of Cincinnati against the defendants and their tenant for the alleged violation of the zoning ordinance. This matter was presented exhaustively to that court and the transcript of the testimony in that hearing was, by agreement of counsel, introduced in the cases at bar.

The answer of the defendants set forth that the action of the city of Cincinnati, including its city council, city planning commission and director of department of buildings, in zoning said defendants' premises in residence "B" district and in excluding the same from the business and industrial districts of said city, and in attempting by said zoning ordinance to prohibit the defendants from using their premises for the uses permitted in business or industrial districts of the city is arbitrary, unreasonable and unjustifiable and constitutes a gross abuse of the power vested in them and a deprivation of these defendants' property rights without compensation and without due process of law, contrary to Article I, Sections 1 and 19 of the Constitution of the state of Ohio, and contrary to the Fourteenth Amendment to the Constitution of the United States of America.

The same defense was set up in the criminal proceedings in the Municipal Court, so that the validity of the zoning

ordinance of the city of Cincinnati as applied to the defendants' property was presented to the Municipal Court and is now before this court. Had the defendants' property been zoned in the business or industrial area, the use to which the defendants are now putting their property would not violate the zoning ordinance.

The constitutionality of the zoning ordinance of the city of Cincinnati was before the Supreme Court of this state in the case of *Pritz* v. *Messer, et al.*, reported in 112 Ohio St., p. 628, syllabus 2 of that decision reading as follows:

"An ordinance enacted by a municipality under Article XVIII, Section 3, of the Ohio Constitution, and under Sections 4366-1 to 4366-12, General Code, dividing the whole territory of the municipality into districts according to a comprehensive plan which, in the interest of the public health, public safety and public morals, regulates the uses and the location of buildings and other structures and of premises to be used for trade, industry, residence, or other specific uses, the height, bulk, or location of buildings and other structures thereafter to be erected or altered, including the percentage of lot occupancy, setback building lines, and the area of yards, courts and other spaces, and for such purpose divides the city into zones or districts of such number, shape, and area as are suited to carry out such purposes, and provides a method of administration therefor, and prescribes penalties for the violation of such provisions, is a valid and constitutional enactment."

The only question before this court, therefore, is whether or not the zoning ordinance as it affects defendants' property is unconstitutional and void. The restriction on the use to which the defendants may put their property imposed by the ordinance has reduced its value according to the testimony submitted in this case. In other words, the testimony reveals that the property in question has greater value for business purposes than it has for residential purposes.

If the health, safety and convenience, or general welfare of the part of the city affected is promoted by placing defendants' property in a residence "B" district, then it makes no difference whether the defendants suffer financial loss or inconvenience. On the other hand, if the health, safety, convenience, or general welfare of the part of the city affected will not be promited by placing the defendants'

property in residence "B" district, then such act upon the part of the city is an invasion of the defendants' property rights and a violation of their constitutional guarantees.

The law on this subject has been clearly enunciated by the Supreme Court of the United States in the case of *Nectow* v. *City of Cambridge, et al.*, 277 U. S., Rep., 183, in which the Supreme Court of the United States reversed the Supreme Judicial Court of the state of Massachusetts, holding that:

"The inclusion of private land in a residential district under a zoning ordinance, with resulting inhibition of its use for business and industrial buildings to the serious damage of the owner, violates the Fourteenth Amendment if the health, safety, convenience or general welfare of the part of the city affected will not be promoted thereby."

Mr. Justice Sutherland delivering the opinion of the court in this case observed:

"The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare."

In order to determine this question the court has viewed the premises, has carefully read the record, and the opinion of the Municipal Court. The finding of facts by that court is concurred in by this court, and is quoted herein in full. The facts are as follows:

"The former village of Delhi, Saylor Park, and Fernbank, constitute a somewhat isolated part of the city of Cincinnati. Generally speaking, their topography is that of a plain about three-quarters of a mile in width, two and one-half miles in length, rising by grade from the Ohio river to the foothills. Toward the east, the territory is connected with the rest of the city of Cincinnati by a narrow neck of ground about a quarter mile in length, extending some three to four miles to the nearest area of population known as Riverside.

"The main highway of the villages is known as Lower River Road, constituting a part of U. S. Highway No. 50. The main line of the St. Louis division of the Big 4 and the B. & O. Railroads traverse the area along the Ohio river.

"The railroad area has a sea-level elevation of 485 feet, which elevation in this territory is subject to overflow by

the Ohio river when the river at Broadway in the city of Cincinnati shows a stage of 63 feet. The territory immediately adjacent to Lower River Road is above high water flood elevation except in the portion at the extreme west or north-west end, where the road enters into the depression constituting what is known as Muddy Creek Valley.

"The property in question herein, known as No. 7469 Lower River Road and which is the subject of this prosecution, is situated on the south side of Lower River Road between Wayne Avenue and Undercliff Road, which is at the extreme western limits of the former village of Fernbank, now the city of Cincinnati. Several hundred feet west of Undercliff Road, Lower River Road is crossed by Muddy Creek, which flows southwardly and empties into the Ohio river. The western boundary of Cincinnati crosses Lower River Road in the vicinity of Muddy Creek. The Ohio river is situated south of Lower River Road, the distance of Wayne Avenue being approximately five hundred feet, and at Muddy Creek and Lower River Road it is about eight hundred feet distant from Lower River Road. This territory is principally lowland and subject to overflow in times of high water. Midway between Lower River Road and the Ohio river are located the main tracks of the St. Louis Division of the Big 4 Railroad and the B. & O. Railroad Company. With the exception of the lots fronting on the south side of Lower River Road, the lowlands have been placed in the so-called "Industrial B" district. Immediately west of Muddy Creek and the west corporation line of Cincinnati is the industrial district of the Village of Addyston, the chief industry being the United States Pipe and Foundry Company, whose grounds abut Muddy Creek on the west. This plant employs at times from five to eight hundred men. The lots fronting on both sides of Lower River Road, between Wayne Road and Muddy Creek, appear on the zoning map of the city of Cincinnati in the "Residence B" district, and as above stated, the property in the rear of the lots fronting on the south side of Lower River Road is zoned "Industrial B" district.

"The property in question herein is located on the south side of Lower River Road, approximately five hundred feet west of the intersection of Wayne Road, and is about one hundred and fifty to two hundred feet east of Undercliff Road. No residence has been erected upon the south side of Lower River road between Wayne Road on the east and Muddy Creek on the west in a period of fifty years last past. The only buildings located on the south side of Lower River Road between said points is the house on the property in question, which was originally constructed as an ice-house, and the building used by the Fernbank Building Materials Company, which previously was used as a tobacco

barn and which is located at the southwest corner of Muddy Creek and Lower River Road. East of the warehouse of the Fernbank Building Materials Company is located a railroad switch connecting with the main tracks of the steam railroad above referred to. The switch at one time crossed Lower River Road and connected with the property on the north side of Lower River Road. This switch is used now to supply freight cars to the building materials company. The record shows further that the building on the property on the north side of Lower River Road, first east of the corporation line, has been converted into a residence and was formerly used as an office for the building materials company above referred to. Between the railroad spur or switch and the property in question herein on the south side of Lower River Road there are no improvements. A stable was recently removed from the territory immediately adjacent to the spur track. On the lot adjoining the locus, on the east, is located the loop of the Cincinnati Street Railway Company. This loop forms the terminus of the street car route extending to Fernbank. This loop is located on private property which was formerly the right of way of the Cincinnati, Lawrenceburg and Aurora Street Railway Company, whose line of railway extended across Lower River Road at that point and continued on to the villages and towns of southeastern Indiana. A bus line connects with the street car loop at this point and interchanges passengers throughout the day. Street cars arrive at the loop at half hour intervals from 5:30 A. M. until 12 o'clock midnight. The cars so arriving lay over at this terminus for short periods or from five to fifteen minutes. Buses arriving at this terminus to meet the passengers alighting from the street cars and also deliver passengers to the street car. These buses park along the roadway and wait to make connections with the street cars. Between this street car line and Wayne Avenue on the south side of Lower River Road is about four hundred feet of vacant land. On the north side of Lower River Road, between the street car line on the east and Muddy Creek on the west, there are but two dwellings and each of these dwellings are on large lots and set back a goodly distance from the street. West of the Fernbank Building Material Company's warehouse and lumber yard the property on both sides of Lower River Road is included in the "Residence B" district, although same is subject to overflow in times of high water and by reason thereof unfit for residence purposes."

"The record further discloses that it would not be financially advantageous to rent the property for residence purposes and that there is a need for a business such as that

conducted by Grace Phelps, which is established by the fact that many requests to operate a business in that vicinity have been made and further that the business of the defendant, Grace Phelps, is being conducted advantageously."

From this finding of fact the Municipal Court came to the conclusion that the operation of the business conducted by the defendants did not bear a substantial relation to the public health, safety, morals, convenience, and public welfare of the inhabitants of the immediate vicinity and for that reason the zoning ordinance as it applied to the property was unreasonable, arbitrary, unjustifiable and in the opinion of the court constituted an abuse of power vested in the city authorities and deprived the defendants of their constitutional guarantees, and thereupon dismissed the defendants.

Upon this finding of fact this court concludes that the improvements in the vicinity of the defendants' property at the time of the enactment of the zoning ordinance, and for many years prior thereto, were of an industrial and business character and that the same condition now prevails.

The court finds further that placing the defendants' property in a residence "B" district under the provisions of the zoning ordinance did not promote the health, safety, convenience or general welfare of the section of the city of Cincinnati affected, and that by reason of the character of the neighborhood affected, the action of the city authorities was unreasonable, arbitrary, unjustifiable and an abuse of power.

The court further finds that the zoning of defendants' property in this fashion and thus restricting the use of the property to residence purposes has resulted in serious damage to defendants.

The court therefore finds that the placing of defendants' property in residence "B" district is an invasion of their property rights, in that it constitutes a taking of their property without due process of law or without compensation in direct violation of the Fourteenth Amendment of the Constitution of the United States, and of Section 19, Article 1, of the Constitution of the state of Ohio. Applications for injunction denied.